[Crim. No. 1830.   Second Appellate District, Division Two.—August 6, 1929.]

THE  PEOPLE,  Respondent,  v.  ROY  HELT,  Appellant.

M. G. Phillips for Appellant.

U. S. Webb, Attorney-General, and James S. Howie, Deputy Attorney-General, for Respondent.

CRAIG, J.—The appellant was charged with possession, control, ownership and operation of a distilling device, intended and used for the manufacture and production of intoxicating liquor, and appeals from a judgment of conviction.

On the evening of January 28, 1929, two officers visited a house in the city of Los Angeles, and while inspecting the premises Roy Helt drove to the rear, parallel with the garage, in an automobile. In response to questions he stated his name, denied that he resided there, or had ever been in the house, and said that he was returning the machine to the garage, that one John Marston was the owner and had loaned it to him. Upon demand therefor he produced a folder containing three keys, one of which fitted the lock on the garage, and with another the officers unlocked the front door of the house. Immediately upon entering they noticed a strong odor of whisky, and could hear a still boiling upstairs. Upon ascending to the second floor they found a still, and large quantities of mash and whisky of more than the legal content of alcohol, fit for beverage purposes. Helt was asked to shut off the still, but stated that he could not do so, and knew nothing about it. He was then taken to the first floor, where all three sat in darkness for some time, awaiting the arrival of Marston, when the telephone rang. One of the officers testified—and it was stipulated that the other would testify likewise—as follows: "Somebody on the other end of the phone said, 'Hello Roy, is that you?' I said, 'Yes.' He said, 'How many cans did it run?' And I was at a loss to make an answer and I hung up." Shortly thereafter it rang again, whereupon the defendant was instructed to answer, and to state that he could not shut the still off, to ask the other party to "come on over," and to say that no officers were there. The witness stood near the telephone where he heard the conversation, and further testified: "He asked the de-

fendant, 'Hello Roy, is that you?' The defendant states, 'Yes.' 'What is the matter?' and he said, 'Nothing.' 'Well, why don't you come on home?' He said, 'I can't get this shut off,' meaning the still. He said, 'Why can't you?' He said, 'I don't know; there is something the matter with it.' And they asked him whether there was the law there.'' Within five or ten minutes the telephone rang a third time, as to which the officer testified: ''There was a lady on the other end of the phone talking and asking him, said: 'Hello, Roy, is that you?' He said, 'Yes.' She said, 'What is the matter?' He said, 'Nothing.' She said, 'Why don't you come home?' Then she asked if the law was there and who it was, and he denied the law being there.'' The defendant testified in his own behalf, that he had been connected with an ice company for about five years, where he had met Marston, and that he had been to the house but once before. He admitted that the telephone rang as stated, denied that he knew any of the parties who had called, or that anyone said ''Hello Roy,'' or asked when he was coming home, how much liquor ran off, or that he shut off the still. He testified that in these conversations he told the parties to send Marston over, believing that they must have known him. When cross-examined concerning his testimony at the preliminary examination, it appeared that he had then sworn that Marston was one of the parties telephoning, and that the latter did tell him to ''shut off the still and get out of there,'' that ''he said he saw lights there while they were there.''

Upon the trial appellant testified that the occasion of his previous one visit to the house in question was to see Marston. In his testimony at the preliminary he stated that he had merely driven past, and had seen Marston in the yard, but that there had been only one such occasion. This state of the record indicated that there had been two, and he then swore that he believed he had testified at the preliminary that he had been there twice before. He denied that anything had been said on the telephone about the lights. The officers' testimony reveals that appellant in driving parallel to the garage could not have driven in the doorway, and that he indicated no intention of so doing. Marston did not appear upon the night in question, nor did he materialize at the preliminary examination, or at the

trial. Appellant knew nothing of his whereabouts, but testified that he had heard indirectly that Marston had gone to Salt Lake City. Finally, he refused to say that he might not have testified at the preliminary contrary to his testimony upon the trial, as disclosed by the record.

■ It is contended that there is not only no evidence in support of the verdict and judgment, but that the evidence positively shows that appellant had no interest in the premises, automobile, distilling apparatus or liquor, and that he had no knowledge thereof. However, as observed, his own statements on the telephone, to the officers, at the preliminary examination, and upon the trial, were in sharp conflict, and many of them were contrary to the positive testimony of one officer and the stipulated testimony of the other. The position of the automobile, possession of the keys to the house and garage, telephone calls for some person of the same name, Roy, within a short time after his arrival, in spite of the fact that Marston's first name was John, and his conflicting statements indicating difficulty in accounting for the situation and circumstances, with no apparent effort to aid in bringing Marston to his rescue, all doubtless had much weight with the jury. It also appears, and is admitted, that he told the officers if they would go to his home Marston might come here. The jury were invested with the right and duty of choosing between the alternatives of accepting as true the testimony of the officers, which, unexplained, furnished strong evidence of guilt, or that of the defendant that he had no knowledge of the existence of the distillery. We cannot say as a matter of law that they were not justified in accepting straightforward, unimpeached evidence, and in rejecting a mass of contradictory statements upon important matters, none of which was corroborated in any way. The citation of authority as to the province of juries in such cases is unnecessary.

Appellant seeks to rely upon *People* v. *Hurley*, 60 Cal. 74 [44 Am. Rep. 55], wherein the defendant was charged with the theft of certain cattle merely because some hides were found in his barn. Four witnesses testified that Hurley had killed his own cattle, and it appeared from the hides in controversy that they were nothing like the animals which had been stolen. Further, it was said: "If the property were in a lock-up room or box, of which he kept the key,

it would be a fair ground for calling upon him for his defense." As to the defendant's showing in that case it was said that there was "no conflict in the evidence upon any material point," and that the People had failed to make out a case. We think the evidence here such that the jury were not unwarranted in believing that appellant was "acting in his own behalf or as the agent, servant, officer or employee" of a person who was the owner of or had an interest in the distilling apparatus in question. (Stats. 1927, p. 497, chap. 277, sec. 1.)

Lastly, it is urged that the trial court committed prejudicial error in refusing to give four requested instructions. █ The first of these is objectionable in that it indicated that to establish the defendant's guilt it must be shown that he intended to claim ownership of the still. Of course, this is not the law. He might lay no claim to ownership, yet be acting for the real owner, in which event, if other elements of the offense charged were established, a complete case would be made against him. █ The third instruction refused also contains a statement which might well be interpreted by the jury as requiring proof of an element not legally required to convict. By it they would have been instructed that if they should find certain facts it would be incumbent upon them to acquit. One of these is that the apparatus "was not upon property over which the defendants had exclusive control." This statement, coupled with other facts indicated as necessary, might well have misled the jury into the belief that in order to convict the defendant it would be necessary to show that he had exclusive control of the property upon which the still was located. █ As to the second and fourth instructions under consideration, it is clear that each of them, as well as those parts in the first and third which were not objectionable as above explained, were amply covered by those given. In that behalf the jury were directed that the prosecution must prove beyond a reasonable doubt that the defendant knew that the still was on the premises and that he exercised some dominion or control over it, and that possession denotes a distinct, personal conscious assertion of control. Further, the jury were charged fully as to circumstantial evidence and the law of principal and accessory, and aider and abetter.

■ Throughout these refused instructions the word "defendants" is used. Ordinarily this might be inconsequential and considered as an oversight, but in this instance, whether intentional or not, it is quite objectionable. Evidence was introduced to show, and the contention was made on behalf of the defendant, that one Marston was the owner of the premises, and that the latter exercised control over the property and apparatus in question. The evidence in that regard so involved Marston that had the court adopted and given instructions repeatedly referring to "the defendants," it is obvious that the minds of the jury might have been confused in such matter as to have vitally prejudiced the prosecution.

The judgment is affirmed.

Works, P. J., concurred.

Thompson (Ira F.), J., being absent, did not participate in this decision.